# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRALEN L. JORDAN,

      Plaintiff,

      v.

DR. R. BROCKMAN, *et al.*,

      Defendants.

No. 4:19-CV-01472

(Judge Brann)

## MEMORANDUM OPINION

### MARCH 19, 2021

Plaintiff Bralen L. Jordan, a federal prisoner confined at the United States Penitentiary at Thompson in Thompson, Illinois, filed a complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,[1] alleging Eighth Amendment excessive force, conditions of confinement, and medical claims against Defendants regarding two incidents that occurred while he was incarcerated at the United States Penitentiary at Lewisburg in Lewisburg, Pennsylvania.[2] Presently before the Court is Defendants' motion to dismiss, or in the alternative, for summary judgment, which Plaintiff has not opposed.[3]  For the reasons that follow, the Court will grant Defendants' motion for summary judgment and dismiss the unserved Defendants.

---

[1]   403 U.S. 388 (1971).
[2]   Doc. 1.
[3]   Doc. 54.

## I.      FACTUAL BACKGROUND

### A.      Allegations of the Complaint

Plaintiff initiated this civil action by complaint on August 26, 2019 against Defendants Dr. R. Brockman, Dr. Andrew Edringer, Mrs. Jessie Ayers, Nurse A. Creveling, Nurse Potter, Nurse H. Lopes, Nurse. L. Hartzel, Lt. Saylor, Lt. Kolwalchick, Lt. Knapp, Lt. Sauloyim, K. Williams, C. Simmons, B. Missiagman, Ofc. C. Hurley, G. Earp, C.O. J. Romig, and Paramedic Barth.[4]   Defendants Sauloyim and Simmons have not been served.

Plaintiff asserts that staff tampered with his food and property, resulting in him being placed in four-point restraints on two occasions, January 19-20, 2019, and again on July 3-5, 2019.[5]  Specifically, as to the January 2019 placement in restraints, Plaintiff alleges that: Officer Williams tampered with his food;[6] Lieutenant Kowalchick did not properly decontaminate him;[7] Nurse Creverling was aware that Lieutenant Kowalchick did not properly decontaminate him;[8] Paramedics Barth and Potter joked and mocked him regarding the denied of treatment;[9] and Psychologist Brockman failed to report allegations of staff misconduct.

---

[4]   Doc. 1.
[5]   *See generally id.*
[6]   *See id.* at 6, 8.
[7]   *See id.* at 6.
[8]   *See id.* at 6, 8.
[9]   *See id.* at 7, 8

As to the July 2019 placement in restraints, Plaintiff alleges that: Officer Hurley trashed his cell;[10] Lt. Saylor placed him in restraints that were too tight;[11] Lt. Knapp used excessive force by pressing his weight on Plaintiff's right arm in order to take his urine;[12] Officer Earp used excessive force by pulling his right arm back after Plaintiff received a surgical injection;[13] Officer Missigman used excessive force by pushing his head down;[14] Dr. Edinger and Medical Provider Ayers refused to provide him with medical attention or an X-ray for his shoulder;[15] and Officer Romig tampered with his food.[16]

There are no allegations against either Defendants Hartzel or Lopes in the complaint.[17]

## B.    Undisputed Facts

Plaintiff was transferred to USP Lewisburg on April 16, 2018 in order to enter the Special Management Unit program.[18]  Plaintiff remained at USP Lewisburg until December 12, 2019.[19]

---

[10]  *Id.* at 9.
[11]  *Id.* at 9, 12.
[12]  *Id.* at 10.
[13]  *Id.* at 11.
[14]  *Id.* at 12.
[15]  *Id.* at 10.
[16]  *Id.* at 11.
[17]  *See generally id.*
[18]  Doc. 65 at 1-2.
[19]  *Id.* at 2.

Designation to the SMU program is non-punitive and is for inmates who require greater management of their interactions to ensure the safety, security, or orderly operation of BOP facilities.[20]   The conditions of the SMU are more restrictive than those of general population inmates.[21]   Inmates designated to the SMU are expected to advance through the program and be designated back to an appropriate general population facility.[22]

### 1.    Plaintiff's Placement in Four Point Restraints

BOP Program Statement 5566.06, Use of Force and Application of Restraints, governs the application of restraints.[23] Staff is authorized to apply physical restraints necessary to gain control if an inmate who appears to be dangerous because the inmate assaults another individual, becomes violent, or displays signs of imminent violence.[24] When the situation dictates, the warden may approve more restrictive or secure restraints.[25]   More secure restraints may be approved when less secure restraints have previously proven ineffective.[26] In those cases, inmates are typically noted to have a history of defeating restraints.[27]

---

[20]   *Id.*
[21]   *Id.*
[22]   *Id.*
[23]   *Id.*
[24]   *Id.*
[25]   *Id.* at 3.
[26]   *Id.*
[27]   *Id.*

When an inmate is placed in four-point restraints, staff is to look for a pattern of non-disruptive behavior over a period of time as an indication that the inmate has regained self-control and is no longer a disruptive threat.[28]   Based on staff assessment, the inmate can either be removed from restraints, continue in them, or be placed in progressively more or less restrictive restraints.[29]

Correctional staff should assess the inmate and log their observations every fifteen minutes.[30]   A lieutenant is also required to assess the inmate and log observations every two hours.[31]   Health Services staff are required to check the restraints twice during each eight hour shift until the inmate is released from restraints.[32]   Psychology staff are required to check the inmate every twenty-four hours until the inmate is released from restraints.[33]   Staff is to videotape the use of force and application of restraints and complete a report of the incident form detailing the incident and staff involved.[34]   An after action review is then performed to determine if staff actions were reasonable and appropriate.[35]

At approximately 3:35 p.m., on January 19, 2019, USP Lewisburg staff requested assistance because Plaintiff was becoming disruptive in G-Block in cell

---

[28]   *Id.*
[29]   *Id.*
[30]   *Id.*
[31]   *Id.*
[32]   *Id.* at 4.
[33]   *Id.*
[34]   *Id.*
[35]   *Id.*

303.[36]  Plaintiff refused to remove his arm from the food slot to allow the officer to close it, complaining about his meal's lack of peanut butter.[37]  The G-Block officer gave Plaintiff numerous orders to place his arm back in the cell which he refused and stated, "You better get the lieutenant."[38]  Upon arrival of the non-party lieutenant, Plaintiff was given numerous orders to place his arm back into the cell which he also refused.[39]  Plaintiff then escalated his disruptive behavior by making threats of imminent violence towards staff, specifically stating, "Go get your fucking team.  I'll kill every motherfucker that comes into the cell to get me."[40]

As a result of Plaintiff displaying signs of imminent violence and threatening staff, the warden authorized a use of force team to remove Plaintiff from his cell and place him in restraints.[41]  Due to Plaintiff's history of defeating restraints, the warden specifically authorized the use of four-point restraints.[42]  Confrontation avoidance was attempted but was unsuccessful with Plaintiff.[43]  Plaintiff continued to refuse orders to remove his arm from the food slot and chemical munitions were employed by Defendant Lieutenant Kowalchick.[44]

---

[36]  *Id.*
[37]  *Id.* at 4-5.
[38]  *Id.* at 5.
[39]  *Id.*
[40]  *Id.*
[41]  *Id.*
[42]  *Id.*
[43]  *Id.*
[44]  *Id.*

Plaintiff was then removed from his cell at which time he became passive resistant and refused to walk under his own power.[45]  Plaintiff was placed on a reeves litter, which is a type of temporary stretcher, and transferred to the third floor landing area where he was decontaminated, visually searched, metal detected, and placed in alternate clothing.[46]  Plaintiff was placed in four-point restraints at approximately 5:15 p.m. and was medically assessed with no injuries noted.[47]  The lieutenant and Defendant Nurse Creverling found the restraints were properly applied.[48]  A restraint check log was completed while Plaintiff was in restraints.[49]  After staff determined Plaintiff had regained self-control, he was removed from restraints at 7:30 p.m. on January 20, 2019.[50]  An after action review of the use of force and application of restraints was conducted and concluded the use of force and application of restraints was reasonable and appropriate.[51]

On July 3, 2019, at approximately 9:18 a.m., staff again requested assistance due to Plaintiff becoming disruptive in G-Block in cell 320.[52]  Plaintiff refused to relinquish his hand restraints and threatened staff after being escorted back to his assigned cell following medical call-out in the health services area.[53]  Once the cell

---

[45]  *Id.* at 6.
[46]  *Id.*
[47]  *Id.*
[48]  *Id.*
[49]  *Id.*
[50]  *Id.*
[51]  *Id.*
[52]  *Id.* at 7.
[53]  *Id.*

door was secured, Plaintiff refused to relinquish his hand restraints to staff.[54]  The non-party G-1 officer gave multiple direct orders to Plaintiff to relinquish his hand restraints, with which orders he refused to comply.[55]  As a result of Plaintiff's display of signs of imminent violence and threatening staff, the warden authorized a use of force team to remove Plaintiff from him the cell and place him in restraints.[56]  Due to Plaintiff's history of defeating restraints, the warden specifically authorized the use of four-point restraints.[57]  Confrontation avoidance proved ineffective so, at Defendant Lieutenant Saylor's direction, staff entered the cell to remove Plaintiff.[58]

While being escorted, Plaintiff became passive resistant and refused to walk under his own power, so he was placed on a reeves litter and carried.[59]  Plaintiff was transferred to X-Block in cell 024 where he was visually searched, metal detected, and placed in alternate clothing while actively resisting staff efforts to remove his institution shirt.[60]

Plaintiff was placed in four-point restraints at approximately 10:43 a.m. as a result of refusing to relinquish his hand restraints and threatening staff.[61]  Plaintiff was medically assessed with no injuries noted.[62]  Lieutenant Saylor and medical staff

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.* at 7-8.
[59] *Id.* at 8.
[60] *Id.*
[61] *Id.*
[62] *Id.*

found the restraints were properly applied.[63]  Neither Defendant Earp nor Defendant Missigman participated in these actions.[64]  Restraint check logs were completed while Plaintiff was in restraints.[65]  Lieutenant Knapp performed four lieutenant restraint checks between 12:00 a.m. and 6:00 a.m. on July 5, 2019.[66]  At each of those restraint checks, Lieutenant Knapp noted Plaintiff refused use of the urinal.[67]

After staff determined Plaintiff had regained self-control, he was removed from restraints at 10:00 a.m. on July 5, 2019.[68]  An after action review of the use of force team and application of restraints was conducted.[69]  After reviewing the staff memoranda and video footage, it was concluded the use of force and application of restraints overseen by Defendant Lieutenant Saylor was reasonable and appropriate.[70]

### 2.    Plaintiff's Medical History at USP Lewisburg

Plaintiff arrived at USP Lewisburg on April 16, 2018 and was medically seen on April 24, 2018, where his chronic conditions and medications were discussed.[71]  On May 24, 2018, Plaintiff was placed in four-point restraints after threatening

---

[63]    *Id.*
[64]    *Id.*
[65]    *Id.*
[66]    *Id.*
[67]    *Id.* at 8-9.
[68]    *Id.* at 9.
[69]    *Id.*
[70]    *Id.*
[71]    *Id.* at 9.

staff.[72]  Plaintiff was monitored by medical staff in accordance with policy while he remained in restraints.[73]  During a restraint check at 6:00 p.m. on May 24, 2018, Plaintiff requested a Health Services staff member to assess his left shoulder.[74]  The exam yielded no trauma or deformity and the staff member advised Plaintiff to avoid manipulating the restraints.[75]  At a subsequent restraint check at 12:00 a.m. on May 25, 2018, Plaintiff again complained of throbbing pain in his shoulder with pain at a "2" on a 1-10 pain scale.[76]  The staff member noted Plaintiff was observed to be continually pulling against the restraints, which he was advised to avoid as the likely cause would be shoulder pain.[77]  Examination showed no trauma, swelling or deformity of the shoulder, and no decrease sensation, numbness, or tingling. Plaintiff again complained of pain in his shoulders at a restraint check at 6:01 a.m. on May 25, 2018.[78]  The staff member again found no injuries and advised Plaintiff to discontinue pulling against the restraints.[79]

On May 26, 2018, Plaintiff reported dull aching pain in his shoulders to Health Services staff during pill line.[80]  Staff noted there to be no outward display of pain

---

72  *Id.* at 10.  This use of force is not at issue in the complaint.
73  *Id.*
74  *Id.*
75  *Id.*
76  *Id.*
77  *Id.*
78  *Id.*
79  *Id.* at 11.
80  *Id.*

by Plaintiff and a full range of motion of both shoulders.[81]   Staff issued a three-day

course of ibuprofen per a verbal order from the physician and provided range of

motion exercises.[82]   On June 5, 2018, staff first noted Plaintiff's elevated average

blood glucose level in an administrative note.[83]   The physician indicated she would

notify Plaintiff of his at-risk status for diabetes and would recheck his blood work in

six months.[84]   Plaintiff next complained of shoulder pain at a sick call encounter with

Defendant Mid-Level Provider Ayers on July 18, 2018.[85]   Plaintiff indicated he had

tried aspirin and range of motion exercises without improvement.[86]   He reported a

pain scale of 7/10.[87]   Defendant Ayers prescribed a thirty-day course of ibuprofen

and recommended Plaintiff avoid upper body work outs, but continue range of

motion exercises to see if there is any improvement.[88]

On August 17, 2018, Defendant Dr. Edinger noted Plaintiff's fasting blood

glucose was high on unrelated pre-operative labs.[89]

The next encounter where Plaintiff complained of shoulder pain occurred on

September 10, 2018, with Defendant Ayers, where Plaintiff alleged left shoulder

---

[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] Id.
[87] *Id.* at 12.
[88] *Id.*
[89] *Id.*

pain and discomfort with a pain scale of 7/10.[90]  An examination showed tenderness and decreased range of motion in Plaintiff's left shoulder.[91]  Defendant Ayers placed an order for an X-ray of Plaintiff's left shoulder to ensure no bony involvement and placed a referral to Orthopedic Surgery.[92]  The X-ray was performed on September 14, 2018, showing no abnormalities.[93]

Plaintiff was seen in the orthopedic clinic on October 3, 2018.[94]  Plaintiff's rotator cuff strength was 5/5 with acromioclavicular joint tenderness and good sensation in his left hand.[95]  The final diagnosis was rotator cuff tendonitis in Plaintiff's left shoulder.[96]  The recommendation was a prednisone injection in the left shoulder, a prescription for the anti-inflammatory meloxicam, and to recheck as needed.[97]  The medications were ordered by Defendant Ayers, as recommended by the orthopedic surgeon.[98]

Plaintiff was evaluated at a chronic care appointment on October 26, 2018.[99]  Plaintiff made no mention of shoulder pain to medical staff at that time.[100]  Plaintiff

---

[90]  *Id.*
[91]  *Id.*
[92]  *Id.*
[93]  *Id.*
[94]  *Id.* at 13.
[95]  *Id.*
[96]  *Id.*
[97]  *Id.*
[98]  *Id.*
[99]  *Id.*
[100]  *Id.*

was also evaluated for diabetes based on his elevated blood glucose levels.[101]   The doctor ordered routine lab work and prescribed Plaintiff metformin to address his blood sugar.[102]

On January 19, 2019, Plaintiff was seen by Defendant Nurse Creveling in Health Services for an injury assessment following Plaintiff's placement in four point restraints.[103]   Plaintiff made no complaints and had no injuries.   Initially, Plaintiff was crying, making wheezing sounds, and speaking in full sentences when speaking to the lieutenant.[104]   Nurse Creveling suspected Plaintiff was feigning the wheezing sounds, which was confirmed when he abruptly stopped when told medical would be evaluating him.[105]   At that time, Plaintiff began shaking his whole body.[106]   Nurse Creveling noted Plaintiff had a resolved diagnosis of asthma, and she had his albuterol inhaler with her should it become necessary.[107]   At no time during the use of force or throughout the exam did Plaintiff require the inhaler or show any signs of distress.[108]

Nurse Creveling noted Plaintiff had been exposed to OC2 gas during the use of force, and had been decontaminated with a portable decontamination device and

---

[101]   *Id.*
[102]   *Id.*
[103]   *Id.* at 14.
[104]   *Id.*
[105]   *Id.*
[106]   *Id.*
[107]   *Id.*
[108]   *Id.*

placed into fresh clothing.[109]   Nurse Creveling indicated the restraints did not compromise Plaintiff's breathing or circulation, that his vital signs were within normal limits, and that he appeared medically stable.[110]   Plaintiff was in four-point restraints from January 19, 2019, through January 20, 2019.[111]   At no point did Plaintiff complain of shoulder pain while in restraints.[112]   All medical restraint checks noted the restraints were appropriately applied with no circulatory or respiratory compromise, and no injuries noted.[113]

On January 19, 2019, at 8:00 p.m., Nurse Creveling checked Plaintiff's blood sugar during a restraint check.[114]   Plaintiff's blood sugar was 112, which was within normal limits and his vital signs were also within normal limits.[115]

On January 20, 2019, at 8:43 a.m. during a restraint check on Plaintiff by Defendant Barth, Plaintiff stated his blood sugar was high.[116]   Defendant Barth checked Plaintiff's blood sugar at that time with a reading of 88, which was within normal limits.[117]   Plaintiff's vital signs were also within normal limits.[118]

---

[109]  *Id.* at 15.
[110]  *Id.*
[111]  *Id.*
[112]  *Id.*
[113]  *Id.*
[114]  *Id.*
[115]  *Id.*
[116]  *Id.* at 16.
[117]  *Id.*
[118]  *Id.*

Psychology staff met with Plaintiff on January 20, 2019 to perform a restraint review.[119]  The psychologist, Defendant Brockman, noted Plaintiff stated he had not eaten in days.[120]  Plaintiff made no other complaints and Dr. Brockman found no deterioration in Plaintiff's mental health.[121]

At 7:52 p.m. on January 20, 2019, Defendant Potter was asked by the Operations Lieutenant to evaluate Plaintiff.[122]  As Plaintiff was being removed from restraints, he began twitching, acting as if he was chewing on his tongue, and stating he needed his insulin because his sugar was high.  Defendant Potter noted Plaintiff was not prescribed insulin.[123]  Defendant Potter checked Plaintiff's blood sugar with a result of 99, which was within normal limits.[124]

Plaintiff was next evaluated at a chronic care appointment on March 4, 2019.[125]  Plaintiff made no mention of shoulder pain at that appointment.  The doctor noted Plaintiff's average blood glucose had improved.[126]  The doctor increased Plaintiff's metformin and ordered routine follow-up lab work.[127]

---

[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] *Id.* at 17.
[125] *Id.*
[126] *Id.*
[127] *Id.*

On April 2, 2019, Plaintiff complained to Health Services staff of numbness in his right hand/fingers since placement in restraints in January 2019.[128]   An examination showed full range of motion in his fingers, but decreased sensation to light touch.  Plaintiff was prescribed an eighteen day course of prednisone.[129]

On May 7, 2019, Defendant Ayers entered a note in Plaintiff's chart noting he complained of bilateral shoulder pain and requested X-rays of his shoulders and back.[130]   A review of Plaintiff's chart showed no recent injuries of complaints of shoulder pain and that he was already prescribed meloxicam.[131]   Defendant Ayers advised Plaintiff to continue the meloxicam, avoid high impact exercises, and to continue range of motion exercises.[132]

On June 10, 2019, Defendant Ayers again noted in Plaintiff's chart that he continued to complain of bilateral shoulder pain.[133]   Defendant Ayers ordered X-rays and referred him to orthopedics for further evaluation.[134]   The X-ray was performed on June 14, 2019, showing no abnormalities; however, minimal distal clavicle osteolysis was noted.[135]  This is a condition that occurs over a period of time and is commonly seen in weightlifters or athletes who perform heavy lifting for a

---

[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *Id.* at 17-18.
[133] *Id.* at 18.
[134] *Id.*
[135] *Id.*

long period of time.[136]   Treatment for this condition can include rest, icing, anti-inflammatory medication, and physical therapy.[137]

Plaintiff was seen in the orthopedic clinic on July 3, 2019.[138]   The exam yielded good rotator cuff strength and range of motion within normal limits bilaterally.[139]   The diagnosis was rotator cuff tendonitis in both left and right shoulders with recommended treatment as continued use of meloxicam, and a prednisone injection in both shoulders, which staff provided.[140]

Following Plaintiff's return from Health Services on July 3, 2019, Plaintiff became disruptive and threatened staff.[141]   As a result, Plaintiff was placed in four-point restraints.[142]   Plaintiff was evaluated by Health Services following a use of force and application of restraints.[143]   The assessment revealed no injuries and staff assured the restraints were appropriately applied.[144]   While being placed in restraints, Plaintiff repeatedly yelled, "I'm a diabetic, I need my sugar checked."[145]   Health Services staff noted Plaintiff's blood sugar would be checked at the next restraint check once he had calmed down.[146]   Staff checked Plaintiff's blood sugar at the next

---

[136]   *Id.*
[137]   *Id.*
[138]   *Id.*
[139]   *Id.*
[140]   *Id.* at 18-19.
[141]   *Id.* at 19.
[142]   *Id.*
[143]   *Id.*
[144]   *Id.*
[145]   *Id.*
[146]   *Id.*

restraint check at 12:00 p.m. on July 3, 2019.[147]  His blood sugar was 110, which was within normal limits.[148]  His vital signs were also within normal limits.[149]

Plaintiff again told staff his sugar was high and he needed insulin at a restraint check at 6:00 p.m. on July 3, 2019.[150]  Defendant Lopes explained to Plaintiff that his blood sugar was within normal limits and that he was not an insulin dependent diabetic.[151]  Plaintiff continued to argue his sugar was high and that he needed insulin.[152]

During a restraint check at 6:00 a.m. on July 5, 2019, Plaintiff reported his shoulders and wrists ached.[153]  Defendant Ayers noted Plaintiff to have slight bilateral hand swelling and blistering secondary to manipulating the restraints.[154]  Defendant Ayers advised Plaintiff of the dangers of continued manipulation of the restraints, which included aggravating his shoulder pain.[155]  Plaintiff was in four-point restraints from July 3, 2019, through July 5, 2019.[156]  All medical restraint checks noted the restraints were appropriately applied with no circulatory or respiratory compromise.[157]

---

[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *Id.* at 19-20.
[151] *Id.* at 20.
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*

Psychology staff met with Plaintiff on July 4, 2019 to perform a restraint review.[158]   Plaintiff told the psychologist he was in a psychological crisis and expressed some suicidal ideation.[159]   As a result, the psychologist performed a suicide risk assessment.[160]   The psychologist ultimately found Plaintiff was not a threat to himself.[161]   The psychologist found no deterioration in Plaintiff's mental health.[162]

Psychology staff also met with Plaintiff on July 5, 2019 to perform a restraint review.[163]   Plaintiff told the psychologist he was angry he was still in restraints.[164] Plaintiff made no other complaints to the psychologist.[165]   The psychologist found no deterioration in Plaintiff's mental health.[166]

On July 17, 2019, Defendant Ayers entered a note in Plaintiff's chart noting his continued complaints of shoulder pain and his request to have his arms X-rayed again.[167]   Given the lack of any trauma while recently in restraints, there was no indication for another X-ray.[168]   Defendant Ayers instructed Plaintiff to utilize his

---

[158] *Id.*
[159] *Id.* at 21.
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*

range of motion exercises, continue his meloxicam as prescribed, and rest his shoulders.[169]  No further workup or treatment was indicated at that time.[170]

On August 21, 2019, Defendant Barth performed an injury assessment on Plaintiff following a use of force.[171]  Plaintiff stated his right shoulder muscle was torn.[172]  Defendant Barth noted a diagnosis of tendonitis in the right shoulder with no other abnormalities.[173]  A physical examination revealed superficial abrasions to the left side of Plaintiff's face and left shoulder.[174]  Plaintiff's vital signs were within normal limits.[175]

Plaintiff made no other complaints about his shoulder until an encounter on August 23, 2019 when he complained to Defendant Ayers that his shoulders hurt.[176]  Defendant Ayers noted Plaintiff to have an abrasion over his left shoulder with pain along the lateral aspects of both shoulders.[177]  Defendant Ayers prescribed Tylenol in addition to Plaintiff's meloxicam and encouraged him to continue range of motion exercises and to avoid behaviors placing him in restraints in order to allow his shoulders to rest.[178]

---

[169] *Id.*
[170] *Id.*
[171] *Id.*  This unspecified use of force is not at issue in the complaint.
[172] *Id.* at 22.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*

PA Ayers renewed Plaintiff's meloxicam prescription on September 19, 2019.[179]

On November 8, 2019, Defendant Ayers noted Plaintiff indicated his metformin was aggravating his stomach.[180]  Defendant Ayers prescribed the antacid ranitidine.[181]

On November 14, 2019, Plaintiff was seen by a doctor for chronic care clinic.[182]  The doctor noted Plaintiff's lab work supported continuing him on his current doses of medication.[183]  The doctor renewed Plaintiff's current medications and ordered renewed lab work.[184]  Plaintiff raised no other concerns regarding his blood sugar or shoulders prior to his transfer from USP Lewisburg on December 12, 2019.[185]

### 3.    Plaintiff's Administrative Remedy History

The Bureau of Prisons tracks formal administrative remedy filings through its computerized SENTRY database.[186]  Since Plaintiff has been designated to the custody of the BOP he has filed 219 administrative remedies.[187]

---

[179]  *Id.*
[180]  *Id.*
[181]  *Id.* at 23.
[182]  *Id.*
[183]  *Id.*
[184]  *Id.*
[185]  *Id.*
[186]  *Id.* at 23.
[187]  *Id.*

A review of Plaintiff's administrative remedies filed during his time at USP Lewisburg shows that Plaintiff filed ninety-three administrative remedies.[188]   Of those administrative remedy filings, Plaintiff only exhausted twelve remedies.[189] Remedies 935750, 967018, 970732, 964736, 969578 involved disciplinary appeals. The remaining exhausted remedies involved Remedy 952661 (requesting to be seen for torn shoulder muscles); Remedy 960665 (requesting a medical transfer due to lack of treatment); Remedy 964288 (alleging medical not treating his blood sugar concerns); Remedy 966494 (alleging he was denied insulin); Remedy 966492 (alleging staff are removing food from his bagged meals); Remedy 974358 (renewal of nasal spray and X-ray request for nerve damage); and Remedy 978597 (appeal of SMU set back and requests transfer).[190]

Remedies 952661, 960665, 964288, 966494, and 974358 each include allegations against Health Services staff for allegedly failing to treat Plaintiff's shoulder pain and/or high blood sugar.[191]   Aside from disciplinary appeals, the only other exhausted filing is Remedy 966492, concerning Plaintiff's allegations that staff improperly tampered with his food by removing items from his bagged lunches.[192] Plaintiff did not exhaust any remedy regarding his placement in four point restraints.

---

[188] *Id.* at 24.
[189] *Id.*
[190] *Id.* at 24-25.
[191] *Id.* at 25.
[192] *Id.*

None of the exhausted remedies concern Plaintiff's allegations against the following staff:  Dr. Brockman allegedly failing to report his allegations of staff misconduct; Lieutenant Kowalchick allegedly failing to properly decontaminate Plaintiff; Officer Hurley allegedly "trashing" Plaintiff's cell during a search on July 3, 2019; Lieutenant Saylor allegedly putting Plaintiff in restraints on July 3, 2019 that were too tight; Lieutenant Knapp allegedly pressing on Plaintiff's arm while holding the urinal; Officer Earp allegedly twisting Plaintiff's arm during the use of force on July 3, 2019; and Officer Missigman allegedly pressing Plaintiff's head down during the July 3, 2019 use of force.[193]

## II.    STANDARD OF REVIEW

Summary judgment should be granted when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.[194]  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law.[195]  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[196]  The Court should view the facts in the light most favorable to the non-

---

[193]  *Id.* at 25-26.
[194]  Fed. R. Civ. P. 56(c).
[195]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[196]  *Id.* at 250.

moving party and make all reasonable inferences in that party's favor.[197]  When the non-moving party fails to refute or oppose a fact, it may be deemed admitted.[198]

Initially, the moving party must show the absence of a genuine issue concerning any material fact.[199]  Once the moving party has satisfied its burden, the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[200]  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."[201]  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.[202]

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'"[203]  Rule 56 mandates the entry of summary judgment against the party who

---

[197]   *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[198]   *See* Fed. R. Civ. P. 56(e)(2); Local R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

[199]   *See Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986).

[200]   *Anderson*, 477 U.S. at 257.

[201]   *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).

[202]   Fed. R. Civ. P. 56(e)(2)-(3).

[203]   *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[204]

Here, Plaintiff has failed to oppose the motion or the facts asserted in Defendants' statement of facts. Pursuant to Federal Rule of Civil Procedure 56(e),[205] the Court has reviewed the facts contained in the statement of facts as well as each fact's citation to the record and will consider each fact undisputed.[206] As such, summary judgment is appropriate here.[207]

## III. DISCUSSION

Defendants raise numerous grounds for the dismissal of certain claims or the entry of summary judgment in their favor. Specifically, Defendants argue that (1) Plaintiff's claims should be dismissed to the extent that he intended to sue Defendants in their official capacities; (2) Plaintiff has failed to exhaust his administrative remedies as to some of his claims, which then bars them; (3) some Defendants were not personally involved in the claims that Plaintiff alleges; (4) Plaintiff's claims for food tampering and medical care fail as a matter of law; and (5) Plaintiff has failed to serve some Defendants within the time permitted by the Federal Rules.

---

[204] *Celotex Corp.*, 477 U.S. at 322.
[205] *See* Fed. R. Civ. P. 56(e)(1).
[206] *See* Fed. R. Civ. P. 56(e)(2).
[207] *See* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it.").

## A.    Official Capacity Claims

Defendants are correct that the official capacity claims must be dismissed with prejudice.   A *Bivens* claim is available only against government officers in their individual capacities.[208]   As such, the official capacity claims against Defendants will be dismissed with prejudice.

## B.    Exhaustion of Administrative Remedies

Defendants are also correct that Plaintiff has failed to exhaust his claims against Defendants Brockman, Missiagman, Hurley, Earp, Saylor, Kolwalchick, and Knapp, including his claim for excessive force.   Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Exhaustion, as a precondition for bringing suit, is a "'threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time.'"[209]   "[T]he . . . exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[210]   A prisoner must exhaust all available administrative remedies even where the relief sought, such as

---

[208] *FDIC v. Meyer*, 510 U.S. 471, 484-87 (1994); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001); *McDonald v. Thomas*, 2015 WL 5032379 at *5 (M.D. Pa. 2015).

[209] *Small v. Camden County*, 728 F.3d 265, 270 (3d Cir. 2013).

[210] *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

monetary damages, cannot be granted through the administrative process, as long as the grievance tribunal has authority to take some responsive action.[211]

The applicable procedural rules for properly exhausting administrative remedies "are defined not by [§ 1997e(a)], but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by [§ 1997e(a)] to 'properly exhaust.'"[212]  The burden of proving non-exhaustion lies with the defendants asserting the defense.[213]  A court evaluating the "threshold" issue of exhaustion looks at whether the inmate "compli[ed] with the prison's specific grievance procedures" and whether those procedures were available to the inmate.[214]

The BOP's Administrative Remedy Program is a multi-tier process that allows "an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."[215]  The inmate first must attempt to informally resolve his issue with the institutional staff.[216]  If informal resolution fails or is waived, the inmate then may submit a formal Administrative Remedy Request on the appropriate BP–9 form within twenty calendar days following the date for which the basis for the

---

[211] *Booth*, 532 U.S. at 741.

[212] *Jones v. Bock*, 549 U.S. 199, 218 (2007).  *See Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010) ("[W]hether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures.").

[213] *Jones*, 549 U.S. at 212, 216–17.

[214] *Rinaldi v United States*, 904 F.3d 257, 265 (3d Cir. 2018) (quoting *Drippe*, 604 F.3d at 781, and *Small*, 728 F.3d at 269-71).

[215] 28 C.F.R. § 542.10.

[216] *See id.* § 542.13(a).

request occurred.[217]   If the inmate is unsatisfied with the warden's response to his

Administrative Remedy Request, he may submit an appeal on the BP–10 form to the

appropriate Regional Director within twenty calendar days of the date the warden

signed the response.[218]   An inmate who is not satisfied with the Regional Director's

response may appeal to the General Counsel on the appropriate BP–11 form within

thirty calendar days of the date the Regional Director signed the response.[219]   An

inmate's appeal to the General Counsel is the final administrative appeal.[220]   Thus,

to satisfy the PLRA's exhaustion requirement, a federal inmate must complete each

step of the BOP's administrative remedy process, which is not considered complete

until an inmate's final appeal is considered by the Central Office.[221]

In Defendants' statement of facts, which Plaintiff does not dispute, it is clear

that while he was incarcerated at USP Lewisburg, he only exhausted his issues with

food tampering and medical treatment.   He did not exhaust the claims regarding

excessive force/placement in restraints or the alleged "trashing" of his cell.   This

does not end the Court's inquiry, however, as it must also consider whether the

applicable administrative remedies were "available" to Plaintiff for his unexhausted

claims.

---

[217] *See id.* § 542.14(a).

[218] *See id.* § 542.15(a).

[219] *See id.*

[220] *See id.*

[221] *See* 28 C.F.R. §§ 542.14-542.15; *Rinaldi*, 904 F.3d at 265; *Schreane v. Marr*, 722 F. App'x 160, 164 (3d Cir. 2018).

In *Ross v. Blake*,[222] the Supreme Court of the United States most recently outlined the three instances in which remedies would not be "available" such that exhaustion may be excused: (1) when an administrative procedure "operates as a simple dead end with officers unable or consistently unwilling to provide relief to aggrieved inmates;" (2) where the administrative remedies are so unclear that "no ordinary prisoner can make sense of what it demands;" and (3) where prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[223]

Here, as Plaintiff has failed to oppose the motion at all, Plaintiff makes no argument that he falls under one of these three categories, nor would they appear to apply to the undisputed facts presented in the motion. Indeed, Plaintiff did utilize the grievance process hundreds of times, as noted above. There is simply no fact or reasonable inference the Court can make that would support a conclusion that the grievance procedure was unavailable to Plaintiff while he was incarcerated at USP Lewisburg.

"[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."[224] Plaintiff has failed to establish that such remedies were

---

[222]  136 S. Ct. 1850 (2016).
[223]  *Id.* at 1859-60.  *See also Rinaldi*, 904 F.3d at 266-67.
[224]  *Rinaldi*, 904 F.3d at 268.

unavailable to him; indeed, he has not opposed the motion for summary judgment at all. Accordingly, this Court finds that as a matter of law that Plaintiff failed to exhaust the administrative remedies that were available to him, as he is required to do by § 1997e(a) prior to filing suit regarding his excessive force claims and his cell "trashing" claim; I will grant summary judgment as to these unexhausted claims.

### C. Lack of Personal Involvement

Turning to the remaining exhausted claims, Defendants next argue that the Court should find that Defendants Edinger, Hartzel, and Lopes lacked sufficient personal involvement in Plaintiff's alleged Eighth Amendment medical indifference claims.

"A defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'"[225] Further, supervisory liability cannot be imposed under § 1983 by *respondeat superior*.[226] "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."[227] A plaintiff must show that an official's conduct caused the deprivation of a federally protected

---

[225] *Baraka v. McGreevey,* 481 F.3d 187, 210 (3d Cir. 2007). *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

[226] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

[227] *Iqbal*, 556 U.S. at 677.

right.[228]  In addition, a prisoner's allegation that prison officials and administrators responded inappropriately or failed to respond to a prisoner's complaint or an official grievance does not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct.[229]

Notably, in the complaint, Plaintiff alleges only that Defendant Edinger failed to report misconduct by other staff members and fails to allege any facts against either Defendant Hartzel or Lopes.  A review of the undisputed material facts demonstrates that none of these three Defendants were involved in Plaintiff's restraint, related medical attention, and alleged food tampering.[230]  As such, summary judgment will be entered in Defendants Edinger, Hartzel, and Lopes' favor.

---

[228] *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970) (A plaintiff "must portray specific conduct by state officials which violates some constitutional right.").

[229] *See Rode*, 845 F.2d at 1207-08 (concluding that review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement); *Pressley v. Beard*, 266 F. App'x 216 (3d Cir. 2008) (prison officials cannot be held liable solely based on their failure to take corrective action when grievances or investigations were referred to them); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006); *Croom v. Wagner*, No. 06-1431, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); *Ramos v. Pennsylvania Dep't of Corrs.*, No. 06-cv-1444, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement).

[230] The Court notes that Defendant Lopes did once advise Plaintiff of his blood sugar level, however there is no indication that he was involved in Plaintiff's treatment or medical care. Even if Defendant Lopes was involved in Plaintiff's medical care and treatment, simply reporting his blood sugar levels and noting that they were within normal limits would be insufficient to support a finding of deliberate indifference.

### D.     Exhausted Claims Regarding Alleged Food Tampering and Medical Care

The remaining exhausted claims involve those against the medical Defendants for allegedly failing to treat his shoulder pain and/or high blood sugar, and the claim against Defendants Officers Romig and Williams for allegedly tampering with Plaintiff's food.  The Court will address each in turn.

The Eighth Amendment requires prison officials to provide adequate food and medical care to prisoners, and does not require that a prisoner receive the food of his preference.[231]  To establish an Eighth Amendment violation, the inmate must show that he has been severely harmed and that prison officials were deliberately indifferent to that harm.[232]  Courts have previously held the denial of one or more meals is not sufficient to establish a constitutional violation.[233]

Here, the undisputed evidence demonstrates that Plaintiff's only complaint as to food tampering is that his peanut butter was missing.  While Plaintiff may have preferred to receive peanut butter with his meal, this dietary demand is not a constitutional violation.  Notably, Plaintiff does not dispute that he received his

---

[231] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

[232] *Id.* at 834.

[233] *See Palmer v. Johnson*, 193 F.3d 346, 353 (5th Cir. 1999) (finding prisoner's allegation of missing one meal does not rise to the level of a cognizable constitutional injury); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985); *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (finding only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim); *Millhouse v. Gee*, 2011 WL 3627414, *13 (M.D. Pa. Aug. 17, 2011); *Islam v. Jackson*, 782 F. Supp. 1111, 1114 (E.D. Va. 1992) (finding missing one meal does not deprive an inmate of basic nutritional needs); *Moss v. Ward*, 450 F. Supp. 591, 596 (W.D.N.Y. 1978) (finding deprivation of one meal may not be cruel and unusual punishment).

meals, simply that one preferred item was missing.  As such, summary judgment is appropriate in Defendants' favor on Plaintiff's Eighth Amendment food tampering claim.

Plaintiff also complains about the lack of medical care he received regarding his shoulder pain and diabetes. "In order to state a cognizable [medical] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[234]  "[T]o succeed under these principles, plaintiffs must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious."[235]  This standard affords considerable latitude for medical professionals within a prison to diagnose and treat the medical problems of inmate patients.[236] Some of the more common situations in which "deliberate indifference" has been found include when the defendant knows of a prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment based on a non-medical reason, and prevents a prisoner from receiving needed or recommended medical treatment.[237]

---

[234]  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[235]  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[236]  *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996).

[237]  *Id.*

Notably, when a prisoner has received medical care and treatment, and the dispute is over the type or adequacy of the treatment, courts are reluctant to second guess the medical providers' judgment.[238] The key question is whether the defendant has provided the plaintiff with treatment, regardless of whether it is the plaintiff's desired course of treatment.[239]

A thorough review of the record demonstrates that Plaintiff received adequate treatment for both his shoulder issues and diabetes. While in restraints, Plaintiff was checked by medical staff to ensure that the restraints were not too tight, and he was checked twice every eight hour period in which he remained in restraints. He was also checked daily by the psychology staff. Aside from Plaintiff's medical care while he was in restraints, it is abundantly clear that he received adequate, quality medical care during his time at USP Lewisburg. For his shoulder pain, Plaintiff received numerous medical appointments and exams, X-rays, orthopedic consultations, and steroid injections, pain medication, and range of motion exercises. As for his diabetes, Plaintiff again received numerous blood tests and medical exams, and, when appropriate, medication to control his diabetes.

That Plaintiff may have preferred a different course of treatment is insufficient to state an Eighth Amendment medical claim. As such, the Court will grant

---

[238] *See*, *e.g.*, *Inmate of Allegheny Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Ellison v. Scheipe*, 570 F. Supp. 1361, 1363 (E.D. Pa. 1983).

[239] *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).

summary judgment in favor of Defendants and as against Plaintiff on his medical care claim.

### E.    Unserved Defendants

Defendants explain in their motion that they have been unable to identify Defendants "Lt. Sauloyim" and "Lt. Simmons" and neither Defendant has been served. Despite being notified of these issues in Defendants' motion, Plaintiff has failed to further identify these defendants or request that the time for serving them be extended. As such, these defendants will be dismissed pursuant to Federal Rule of Civil Procedure 4(m) (requiring service of Defendants within ninety days from the filing of the complaint).

## IV.    CONCLUSION

Based on the foregoing, the Court will grant the motion, dismiss the official capacity claims against Defendants, dismiss Defendants Lt. Sauloyim and Lt. Simmons, and enter judgment in the remaining Defendants' favor.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge